## UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| **SCOTT POWERS** and **JOSEPH FINNERTY**, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>**SOLARAY LLC, d/b/a STRATEGIC RETAIL PARTNERS,**<br><br>      Defendant. | Case No. 1:25-cv-03304<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Scott Powers and Joseph Finnerty ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Solaray LLC, d/b/a Strategic Retail Partners ("SRP" or "Defendant"), alleging as follows, based upon information and belief, investigation of counsel, and personal knowledge of Plaintiffs.

### INTRODUCTION

1. This class action arises from Defendant's failure to protect highly sensitive data of an undisclosed number of people. Plaintiffs are current and former employees of Defendant.

2. It is unclear when Defendant discovered it had lost control over its computer network. However, the cybercriminal group known as Medusa accessed 1.35 TB of highly sensitive personal information stored on its computer network on at least two separate incidents.

3. The first Data Breach occurred between February 3, 2025 and February 6, 2025. The second Data Breach occurred at some point in March 2025.

4.      On or about October 8, 2025—approximately 8 months after the first data Breach— Defendant finally began notifying Class Members about the first data breach, but Defendant never notified impacted individuals of the second data breach. The notice Defendant posted to the Attorney General of Maine's website is attached as Exhibit 1, and the notice Plaintiffs Scott Powers received is attached as Exhibit 2.

5.      The data compromised in the first Data Breach included personally identifiable information ("PII"), including names, driver's license numbers, state identification numbers, Passport numbers, Social Security numbers, US alien registration numbers, and financial account information, as well as protected health information ("PHI") including medical information and health insurance information. Exhibit 1. Plaintiffs refers to both categories as "PII/PHI."

6.      Upon information and belief, cybercriminals were able to breach Defendant's systems over a period of four days because Defendant failed to adequately train its employees on cybersecurity, failed to adequately monitor its agents, contractors, vendors, and suppliers in handling and securing the PII/PHI of Plaintiff, and failed to maintain reasonable security safeguards or protocols to protect the Class's PII/PH—rendering it an easy target for cybercriminals.

7.      Even after the four-day long Data Breach, SRP did not take adequate precautions to secure its systems. A month later, in March 2025, Medusa hacked the company again. SRP only publicly acknowledged one breach in February 2025 and has not verified any of Medusa's claims.[1]

8.      Defendant's Notice intentionally obfuscates the nature of the first Data Breach and the threat it posed. The Notice failed to disclose how many people were impacted, how the Data

---

[1] Paul Bischoff, *Ransomware gang says it hacked merchandise distributor SRP not once, but twice* (Oct. 9, 2025), COMPARITECH, https://www.comparitech.com/news/ransomware-gang-says-it-hacked-merchandise-distributor-srp-not-once-but-twice/ (last visited October 20, 2025).

Breach happened, who perpetrated the breach, whether a ransom was demanded or paid, exactly

when it discovered the breach, whether it was able to secure its systems during or after the breach,

or why it took the Defendant approximately seven months before it finally began notifying some

victims that cybercriminals had gained access to their highly private information. Worse, the

Notice entirely omits any mention of the second Data Breach in March 2025.

9.      Additionally, the information contained within Defendant's Notice contradicts the

representations Defendant made to the Attorney General of Maine. Defendant reported to the

Attorney General of Maine that it did not discover the data breach until August 13, 2025, an

appalling six months after the data breach first began, although it claims in its Notice that it became

aware of "suspicious activity" on February 6, 2025—just three days after the Data Breach began.[2]

The fact Defendant did not discover the first Data Breach in a timely manner, regardless of whether

it took Defendant six months of three days, underscores its grossly inadequate cybersecurity

measures.

10.     Defendant's deliberate failure to timely report the first Data Breach, and failure to

report the second Data Breach, made the victims vulnerable to identity theft without any warnings

to monitor their financial accounts or credit reports to prevent unauthorized use of their PII/PHI.

11.     Defendant knew or should have known that each victim of the Data Breaches

deserved prompt and efficient notice of the Data Breaches and assistance in mitigating the effects

of PII/PHI misuse.

12.     In failing to adequately protect its current and former employees' information,

adequately notify them about the breach, and obfuscating the nature of the breach, Defendant

---

[2] *Data Breach Notification*, OFFICE OF THE MAINE ATTORNEY GENERAL,
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
a1252b4f8318/6da9535a-5667-4114-8125-88f26fac0697.html (last visited October 20, 2025).

violated state law and harmed an unknown number of its current and former employees and customers.

13.    Plaintiffs and the Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendant with their PII/PHI. But Defendant betrayed that trust when Defendant failed to properly use up-to-date security practices to prevent the Data Breaches.

14.    Plaintiff Scott Powers is a former employee of Defendant and victim of the first Data Breach. His name, driver's license number, Social Security number, financial account information, medical information, and health insurance information was compromised in the first Data Breach. Exhibit 2.

15.    Defendant had no legitimate reason to maintain Mr. Powers' PII/PHI, considering his employment with Defendant had ended more than five years ago.

16.    Plaintiff Joseph Finnerty is a current employee of Defendant and upon information, a victim of the first or second Data Breach. Upon information and belief, at least his name, contact information, Social Security number, and financial account information, were compromised.

17.    The exposure of one's PII/PHI to cybercriminals is a bell that cannot be unrung. Before the Data Breaches, the private information of Plaintiffs and the Class was exactly that—private. Not anymore. Now, their private information is permanently exposed and unsecure.

## PARTIES

18.    Plaintiff Scott Powers is a natural person and citizen of Liverpool, New York, where he intends to remain.

19.    Plaintiff Joseph Finnerty is a natural person and citizen of Phoenix, Arizona, where he intends to remain.

20.     Defendant Solaray LLC is a business corporation incorporated in Colorado, with
its principal place of business at 85 Rio Grande Drive, Suite 200, Castle Rock, Colorado 80104.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under the Class Action
Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of
interest and costs. Members of the proposed Class are citizens of different states than Defendant
and there are over 100 putative Class members. After all, an undisclosed number of people were
affected, including persons residing in at least the following states: New York, Arizona, New
Hampshire, Texas, Massachusetts, and Maine.[3]

22.     This Court has personal jurisdiction over Defendant because it is headquartered in
Castle Rock, Colorado, it regularly conducts business in Colorado, and has sufficient minimum
contacts in Colorado.

23.     Venue is proper in this Court because Defendant's principal office is in this District,
and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims
occurred in this District.

## BACKGROUND

### _Defendant Collected and Stored the PII/PHI of Plaintiffs and the Class_

---

[3] *See* NEW HAMPSHIRE DEPARTMENT OF JUSTICE, https://mm.nh.gov/files/uploads/doj/remote-docs/strategic-retail-partners-20251008.pdf; *Data Security Breach Reports,* ATTORNEY GENERAL OF TEXAS, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage; *Data Breach Notification*, OFFICE OF THE MAINE ATTORNEY GENERAL, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/6da9535a-5667-4114-8125-88f26fac0697.html; *Security Breach Notifications, and Data Breach Report 2025,* MASS.GOV, https://www.mass.gov/doc/data-breach-report-2025/download (last visited October 20, 2025).

24.     SRP  is a retail merchandising company based in Colorado. Founded originally in 1969 as Solaray, it merged with PUGS in 2014 to form SRP Companies. SRP currently provides in-store merchandising solutions to retail partners, including a portfolio of retail products and store distribution, as well as merchandising representatives that develop customized product assortments for retail business. Product brands offered by SRP includes Solaray, Pugs, AES, Global Eyewear, Cloudz, Celltronix, Norlite, Fiesta, MC Sweets, and more.[4]

25.     Headquartered in Castlerock, Colorado, SRP has additional locations in Oklahoma, Virginia, Utah, Florida, Texas, North Carolina, Missouri, Ohio, Georgia, Tennessee, Pennsylvania, California, Alabama, Minnesota, Kentucky, Arizona, New Mexico, Arkansas, South Carolina, and Washington state, and employs over 1,000 individuals.[5]

26.     On information and belief, SRP  accumulates highly private PII/PHI of its employees, including information protected by HIPAA. Given its age, SRP  has accrued over 50 years of data.

27.     In collecting and maintaining PII/PHI, SRP agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII/PHI.

28.     SRP understood the need to protect its current and former employees' PII/PHI and prioritize its data security.

29.     SRP  promises it only shares information in limited circumstances, such as when legally required to do so, with business partners, or with consent. It also falsely states:

---

[4] *Strategic Retail Partners,* SRP, https://www.srpcompanies.com/about-us (last visited October 20, 2025).
[5] *Strategic Retail Partners,* LINKEDIN, https://www.linkedin.com/company/srp-companies/about/ and *Browse Strategic Retail Partners office locations,* INDEED, https://www.indeed.com/cmp/Strategic-Retail-Partners/locations (last visited October 20, 2025).

We have implemented appropriate technical and organizational security measures
designed to protect the security of any personal information we process.

We will only keep your personal information for as long as it is necessary for the
purposes set out in this privacy policy, unless a longer retention period is required or
permitted by law (such as tax, accounting, or other legal requirements).

When we have no ongoing legitimate business need to process your personal information,
we will either delete or anonymize it, or, if this is not possible (for example, because your
personal information has been stored in backup archives), then we will securely store
your personal information and isolate it from any further processing until deletion is
possible.[6]

30.     Despite recognizing its duty to do so, on information and belief, SRP has not
implemented reasonable cybersecurity safeguards or policies to protect the PII/PHI of its current
and former employees, or trained its IT or data security employees to prevent, detect, and stop
breaches of its systems. As a result, SRP leaves significant vulnerabilities in its systems for
cybercriminals to exploit and gain access to employees' PII/PHI.

***Defendant Failed to Safeguard the PII/PHI of Plaintiffs and the Class***

31.     Plaintiffs are current and former employees of Defendant.

32.     As a condition of receiving employment from Defendant, Plaintiffs provided
Defendant with his PII/PHI.

33.     On information and belief, Defendant collects and maintains its employees'
unencrypted PII/PHI in its computer systems.

34.     In collecting and maintaining PII/PHI, Defendant implicitly and explicitly agreed
that it will safeguard the data using reasonable means according to state and federal law.

35.     For four days in February 2025, and for an unknown period of time in March 2025,
cybercriminals hacked Defendant's network and accessed extremely sensitive information,

---

[6] *Strategic Retail Partners, Privacy Policy – USA & EU,* SRP,
https://www.srpcompanies.com/about-us (last visited October 20, 2025).

including Social Security numbers, financial account information, and protected health information.

36.    It is unclear when cybercriminals first gained access to Defendant's computer systems, how long each Data Breach lasted, and when Defendant discovered the Data Breaches.

37.    The fact over 135 TB of data was stolen from Defendant demonstrates Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of thousands of its employees' highly private information continuously.

38.    Despite the fact Medusa has posted the stolen data online, Defendant has not yet notified victims of the Data Breach of the second Data Breach.

39.    Thus, Defendant continues to keep the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner. In so doing, Defendant has deprived Plaintiffs and the Class of the earliest opportunity to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breach.

40.    Despite its duties to safeguard PII/PHI, Defendant did not in fact follow industry standard practices in securing employees' PII/PHI, as evidenced by the Data Breach. In fact, Defendant did not even delete the PII/PHI of its former employees, although it had no legitimate reason to maintain it.

41.    Defendant's repeated failures to adopt adequate cybersecurity measures demonstrates that there is a substantial risk of another breach of its systems, or that another breach is certainly impending.

42.     Even with the purchase of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' PII/PHI is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

43.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's PII/PHI (although here, this data was compromised). Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs and the Class's financial accounts.

44.     On information and belief, Defendant failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its employees' PII/PHI. Defendant's negligence is evidenced by its failure to prevent the Data Breach, and to stop cybercriminals from accessing the PII/PHI it stored in its network.

45.     Furthermore, Defendant intentionally obfuscates the nature of the breach, failing to clearly inform the public when exactly Defendant discovered the breach, how it happened, how many people were impacted, who perpetrated the breach, whether a ransom was demanded or paid, whether it was able to secure its systems during or after either breach, or why it took the Defendant approximately eight months before it finally began notifying some victims that cybercriminals had gained access to their highly private information.

46.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts.

47.     Despite Defendant's intentional opacity about the root cause of the data breach and its impact, several facts can be gleaned from the notice including that: (1) this data breach was the

work of cybercriminals; (2) cybercriminals successfully infiltrated SRP's network environment (*i.e.,* "there was unauthorized access to our network"); and (3) once inside, cybercriminals targeted highly private information for download and theft (*i.e.,* "certain information stored within our network was accessed and/or copied without permission.") Exhibits 1 and 2.

48.     While Defendant claims it is "not aware of your information being used to commit identity theft or fraud," it did not encourage victims to report sigs of fraud or identify theft, or provide contact channels for ongoing updates or reports of suspicious activity. Given Medusa's involvement, such a statement is misleading at best.

49.     By sending notice letters, Defendant admits that it itself reasonably believes that PII/PHI was acquired by an unnamed third party.

***Medusa Obtained the PII/PHI of Plaintiffs and the Class and Posted it for Sale***

50.     Through its inadequate security practices, Defendant exposed Plaintiffs' and the Class Members' PII/PHI for theft and sale on the Dark Web.

51.     Worryingly, the cybercriminals that obtained Plaintiffs' and Class members' PII/PHI appear to be the notorious cybercriminal group "Medusa."[7]

52.     Medusa first appeared in September 2019 and debuted its leak site in February 2023, where it publishes stolen data of victims who don't pay ransoms.[8]

53.     Medusa both locks down computer systems and steals data, forcing infected organizations to pay a ransom to restore systems and to not publish stolen data. The gang operates

---

[7] Paul Bischoff, *Ransomware gang says it hacked merchandise distributor SRP not once, but twice* (Oct. 9, 2025), Comparitech, https://www.comparitech.com/news/ransomware-gang-says-it-hacked-merchandise-distributor-srp-not-once-but-twice/ (last visited October 20, 2025).
[8] *Id.*

a ransomware-as-a-service scheme in which customers pay to use Medusa's malware and infrastructure to launch attacks and collect ransoms.[9]

54.    In February, ransomware gang Medusa took credit for stealing 1.35 terabytes of data from Strategic Retail Partners and demanded a $1.2 million ransom.[10]

55.    1.35 terabytes is a massive amount of data and can hold a huge variety of content. For context, 1 terabyte is equivalent to 1,000 gigabytes, and 1 gigabyte is equivalent to 1,000 megabytes. Thus, 1.45 terabytes is equivalent to 1,350,000 megabytes. The entire written works of Shakespeare could fit inside just 5 megabytes.[11]

56.    In March, Medusa claimed it hacked the company again because it failed to pay them, and failed to update its cybersecurity, and demanded a second $1 million ransom.[12] A copy of Medusa's post to its Dark Web website is posted below:

---

[9] *Id.*

[10] *Id.*

[11] Paulette Kehely, *How Many Documents in a Gigabyte?* (April 2, 2020), DWR EDISCOVERY, https://www.digitalwarroom.com/blog/how-many-pages-in-a-gigabyte (last visited September 15, 2025).

[12] Paul Bischoff, *Ransomware gang says it hacked merchandise distributor SRP not once, but twice* (Oct. 9, 2025), COMPARITECH, https://www.comparitech.com/news/ransomware-gang-says-it-hacked-merchandise-distributor-srp-not-once-but-twice/ (last visited October 20, 2025).





Medusa says it breached SRP a second time in March 2025.

57.     Because SRP did not pay Medusa the first ransom it demanded, Medusa has ***already leaked*** the stolen PII/PHI of thousands of Defendant's current and former employees.

58.     Thus, on information and belief, Plaintiffs' and the Class's stolen PII/PHI has already been published—or will be published imminently—by cybercriminals on the Dark Web.

59.     Even if Defendant paid Medusa a ransom, the PII/PHI of Plaintiffs and the Class is still not secure. Indeed, cybercriminals often demand a ransom in exchange for assurances that they will not publish the data, and then publish it anyways.

60.     Here, Medusa posted stolen data for sale twice, and confirmed that Defendant did not pay.

13

61.     Therefore, upon information and belief, SRP 's Notice to Plaintiffs and the Class is false, intentionally misleading, and intentionally downplays the severity of the Data Breach and the threat it poses to thousands of individuals.

**_Defendant Knew—or Should Have Known—of the Risk of a Data Breach_**

62.     It is well known that PII/PHI, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

63.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

64.     In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[13]

65.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[14]

66.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in the retail merchandising industry, including Defendant.

---

[13] *2024 Data Breach Annual Report* at 6, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter. org/publication/2024-data-breach-report/ (last visited October 20, 2025).

[14] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited October 20, 2025).

67.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII/PHI private and secure, Defendant failed to take appropriate steps to protect the PII/PHI of Plaintiffs and Class Members from being compromised.

68.     This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included extortion and threatening to release stolen data.

69.     In light of the information readily available and accessible before the Data Breach, Defendant, knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII/PHI could be accessed, exfiltrated, and published as the result of a cyberattack. Data breaches are so prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

### *Plaintiff Scott Powers Experience and Injuries*

70.     Plaintiff Powers is a former employee of Defendant and a data breach victim.

71.     As a condition of receiving employment, Defendant required Plaintiff Powers to provide his PII/PHI, including at least his name, driver's license number, Social Security number, financial account information, medical information, and health insurance information.

72.     Plaintiff Powers provided his PII/PHI to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

73.     Additionally, Plaintiff Powers reasonably expected that his personal information would be destroyed once his employment with Defendant ended. It was not.

74.    Indeed, Defendant confirmed in its privacy policy that "We will only keep your personal information for as long as it is necessary for the purposes set out in this privacy policy," but Plaintiff Powers has not been employed by Defendant for over five years. Thus, there was no legitimate need to for Defendant to retain his PII/PHI.

75.    Had Plaintiff Powers known that Defendant does not adequately protect PII/PHI, he would not have agreed to provide his PII/PHI to it. Additionally, had Plaintiff Powers known that Defendant would not delete his PII/PHI once their business relationship had ended, he would not have agreed to provide Defendant with his PII/PHI.

76.    Plaintiff Powers received Notice of the Data Breach in October 2025. Plaintiff Powers was surprised to have received this Notice, considering his employment with Defendant had ended more than five years ago. Defendant should not have stored Plaintiff Powers' PII/PHI beyond the time necessary to achieve its initial purpose of collection. Defendant had no need of Plaintiff Powers' Social Security number once his employment ended, and should have promptly deleted it.

77.    Plaintiff Powers is very careful about sharing his sensitive PII/PHI. Plaintiff Powers stores any documents containing his PII/PHI in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII/PHI over the internet or any other unsecured source. Plaintiff Powers would not have entrusted his PII/PHI to Defendant had he known of Defendant's lax data security policies.

78.    As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff Powers' PII/PHI for theft by cybercriminals and sale on the dark web.

79.    Indeed, given Medusa's Dark Web post, Plaintiff Powers' PII/PHI has been published, or will be published imminently by Medusa for further theft and sale on the Dark Web.

80.     Plaintiff Powers does not recall ever learning that his PII/PHI was compromised in former a data breach incident, other than the breach at issue in this case.

81.     Defendant deprived Plaintiff Powers of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

82.     Plaintiff Powers suffered actual injury from the exposure of his PII/PHI —which violates his rights to privacy.

83.     Plaintiff Powers suffered actual injury in the form of damages to and diminution in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that Defendant was required to adequately protect.

84.     Plaintiff Powers has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, and monitoring his credit information.

85.     Plaintiff Powers has already spent substantial time dealing with the Data Breach, and will continue to spend valuable time he would have otherwise spent on other activities, including but not limited to, work and/or recreation. Plaintiff Powers' efforts were reasonable and necessary given that Medusa has published stolen PII/PHI on the Dark Web.

86.     Plaintiff Powers fears for his personal financial security. Plaintiff Powers has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. Plaintiff Powers is experiencing anxiety, distress, and fear regarding how the exposure and loss of his Social Security number will impact him. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses. These emotional injuries were caused by Plaintiff

Powers' exposure to a heightened risk—of identity theft and fraud—which has been substantially elevated because Medusa published stolen PII/PHI on the Dark Web, and SRP has since experienced two data breaches, indicating Plaintiff Powers' information remains unprotected while in SRP's possession.

87.    Plaintiff Powers is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII/PHI being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to adopt adequate cybersecurity measures in response to the first Data Breach leading to a subsequent data breach only one month later, combined with Defendant's unclear Notice and failure to promptly inform Plaintiff Powers about the Data Breach.

88.    Once an individual's PII/PHI is for sale and access on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[15] Plaintiff Powers' name, date of birth, Social Security number, and medical information were compromised as a result of the Data Breach.

89.    Plaintiff Powers has a continuing interest in ensuring that his PII/PHI, which, upon information and belief, remains in Defendant's possession despite the fact he is no longer employed by Defendant, is protected and safeguarded from future breaches. Indeed, a second data breach occurred just one month after the first data breach, indicating that Defendant did not take adequate steps to reform its cybersecurity measures after the first data breach. Therefore, there is a substantial risk of another breach of SRP's systems, or that a breach is certainly impending.

***Plaintiff Joseph Finnerty's Experience and Injuries***

---

[15] *What do Hackers do with Stolen Information,* AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited October 20, 2025).

90.    Plaintiff Finnerty is a current employee of Defendant and upon information and belief, a data breach victim.

91.    As a condition of receiving employment, Defendant required Plaintiff Finnerty to provide his PII/PHI, including at least his name, date of birth, address, Social Security Number, financial account information, and health information.

92.    Plaintiff Finnerty provided his PII/PHI to Defendant and trusted that the company would use reasonable measures to protect it according to state and federal law.

93.    Had Plaintiff Finnerty known that Defendant does not adequately protect PII/PHI, he would not have agreed to provide his PII/PHI to it.

94.    Plaintiff Finnerty is very careful about sharing his sensitive PII/PHI. Plaintiff Finnerty stores any documents containing his PII/PHI in a safe and secure location. He has never knowingly transmitted unencrypted sensitive PII/PHI over the internet or any other unsecured source. Plaintiff Finnerty would not have entrusted his PII/PHI to Defendant had he known of Defendant's lax data security policies.

95.    As a result of its inadequate cybersecurity measures and data destruction policies, Defendant exposed Plaintiff Finnerty' PII/PHI for theft by cybercriminals and sale on the dark web.

96.    Indeed, given Medusa's Dark Web post, Plaintiff Finnerty' PII/PHI has been published, or will be published imminently by Medusa for further theft and sale on the Dark Web.

97.    Plaintiff Finnerty does not recall ever learning that his PII/PHI was compromised in former a data breach incident, other than the breach at issue in this case.

98.    Defendant deprived Plaintiff Finnerty of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

99.    Plaintiff Finnerty suffered actual injury from the exposure of his PII/PHI —which
violates his rights to privacy.

100.    Plaintiff Finnerty suffered actual injury in the form of damages to and diminution
in the value of his PII/PHI. After all, PII/PHI is a form of intangible property—property that
Defendant was required to adequately protect.

101.    Plaintiff Finnerty has spent time and made reasonable efforts to mitigate the impact
of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card
and financial account statements, changing his online account passwords, and monitoring his credit
information.

102.    Plaintiff Finnerty has already spent a substantial amount of time dealing with the
Data Breach, and will continue to spend valuable time he would have otherwise spent on other
activities, including but not limited to, work and/or recreation. Plaintiff Finnerty' efforts were
reasonable and necessary given that Medusa has published stolen PII/PHI on the Dark Web.

103.    Plaintiff Finnerty fears for his personal financial security and uncertainty over what
PII/PHI was exposed. Plaintiff Finnerty has and is experiencing feelings of anxiety, sleep
disruption, stress, fear, and frustration because of the Data Breach. Plaintiff Finnerty is
experiencing anxiety, distress, and fear regarding how the exposure and loss of his Social Security
number will impact him. This goes far beyond allegations of mere worry or inconvenience; it is
exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.
These emotional injuries were caused by Plaintiff Finnerty' exposure to a heightened risk—of
identity theft and fraud—which has been substantially elevated because Medusa published stolen
PII/PHI on the Dark Web, and SRP has since experienced a subsequent data breach of its Health

Care Plan, indicating Plaintiff Finnerty' information remains unprotected while in SRP's possession.

104.    Plaintiff Finnerty is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII/PHI being placed in the hands of unauthorized third parties. This injury is worsened by Defendant's failure to adopt adequate cybersecurity measures in response to the first Data Breach leading to a subsequent data breach only one month later, combined with Defendant's unclear Notice and failure to promptly inform Plaintiff Finnerty about the Data Breach.

105.    As a result of its inadequate cybersecurity measures and data destruction policies, Plaintiff Finnerty suffered multiple instances of identity theft and fraud.

106.    Just several months after the Data Breach, Plaintiff Finnerty received a notification from Bank of America stating that a payment attempt to "Dubai Air" had been declined. Plaintiff Finnerty has never held an account with Bank of America and did not authorize or initiate this charge—clear evidence that his personal and financial information was used fraudulently by an unknown third party.

107.    In addition, within the past six months, Plaintiff Finnerty has received approximately six separate alerts from his actual bank regarding unauthorized payment attempts— further confirming that his sensitive data has been compromised and is actively being exploited for fraudulent activity.

108.    Plaintiff Finnerty has also experienced a substantial increase in scam and spam texts and phone calls. Many of these solicitations claim he has been pre-approved for loans and credit cards he has never applied for.

109.    Once an individual's PII/PHI is for sale and access on the dark web, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[16] Upon information and belief, Plaintiff Finnerty' PII/PHI was compromised as a result of the Data Breach.

110.    Plaintiff Finnerty has a continuing interest in ensuring that his PII/PHI, which, upon information and belief, remains in Defendant's possession is protected and safeguarded from future breaches. Indeed, a second data breach occurred just one month after the first data breach, indicating that Defendant did not take adequate steps to reform its cybersecurity measures after the first data breach. Therefore, there is a substantial risk of another breach of SRP's systems, or that a breach is certainly impending.

### *Plaintiffs and the Class Suffered Common Injuries and Damages Due to Defendant's Conduct*

111.    Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII/PHI that can be directly traced to Defendant.

112.    As a result of Defendant's failure to prevent the Data breaches, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. Plaintiffs and the class have suffered or are at an increased risk of suffering:

a.    Identity theft and fraud;

b.    The loss of the opportunity to control how their PII/PHI is used;

c.    The diminution in value of their PII/PHI;

d.    The compromise and continuing publication of their PII/PHI;

---

[16] *What do Hackers do with Stolen Information,* AURA, https://www.aura.com/learn/what-do-hackers-do-with-stolen-information (last visited October 20, 2025).

e.   Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

f.   Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data breaches, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

g.   Delay in receipt of tax refund monies;

h.   Unauthorized use of stolen PII/PHI; and

i.   The continued risk to their PII/PHI, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII/PHI in its possession.

### *Significant Risk of Continued Identity Theft*

113.    Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breaches.

114.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

115.    The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

116.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

117.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[17] Criminals in particular favour the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[18] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

118.    The unencrypted PII/PHI of Plaintiffs and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. In addition, unencrypted and detailed PII/PHI may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' PII/PHI.

119.    Theft of Social Security numbers also creates a particularly alarming situation for victims because those numbers cannot easily be replaced. In order to obtain a new number, a breach victim has to demonstrate ongoing harm from misuse of their SSN, and a new SSN will not be provided until after the victim has suffered the harm.

---

[17] *What Is the Dark Web?* EXPERIAN, available at https://www.experian.com/blogs/ask-experian/what-isthe-dark-web/ (last visited October 20, 2025).
[18] *Id.*

120.    Due to the highly sensitive nature of Social Security numbers, theft of Social Security numbers in combination with other PII (e.g., name, address, date of birth) is akin to having a master key to the gates of fraudulent activity. TIME quotes data security researcher Tom Stickley, who is employed by companies to find flaws in their computer systems, as stating, "If I have your name and your Social Security number and you haven't gotten a credit freeze yet, you're easy pickings."[19]

121.    There may also be a time lag between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. Fraud and identity theft resulting from the Data Breaches may go undetected until debt collection calls commence months, or even years, later. An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

122.    For example, on average it takes approximately three months for consumers to discover their identity has been stolen and used, and it takes some individuals up to three years to learn that information.[20]

123.    It is within this context that Plaintiffs and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black market.

---

[19] Patrick Lucas Austin, *'It Is Absurd.' Data Breaches Show it's Time to Rethink How We Use Social Security Numbers, Experts Say*, TIME (Aug. 5, 2019), https://time.com/5643643/capital-one-equifax-data-breach-social-security/.
[20] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 Journal of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

124.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

125.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

126.    Identity thieves can also use an individual's personal data and PII/PHI to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[21]

127.    One example of criminals piecing together bits and pieces of compromised PII/PHI to create comprehensive dossiers on individuals is called "Fullz" packages.[22] These dossiers are

---

[21] *Identity Theft and Your Social Security Number,* SOCIAL SECURITY ADMINISTRATION, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf. (last visited October 20, 2025).

[22] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that

both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. For example, they can combine the stolen PII/PHI, and with unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

128.    The development of "Fullz" packages means that the PII/PHI exposed in the Data Breaches can easily be linked to data of Plaintiffs and the Class that is available on the internet. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class members' stolen PII/PHI is being misused, and that such misuse is fairly traceable to one or both of the Data Breaches.

---

can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.,* Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm,* KREBS ON SECURITY (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited October 20, 2025).

129. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[23]

130. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[24] Yet, Defendant failed to rapidly report to Plaintiffs and the Class that their PII/PHI was stolen. Defendant's failure to promptly and properly notify Plaintiffs and Class members of the Data Breaches exacerbated Plaintiffs and Class members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII/PHI and take other necessary steps to mitigate the harm caused by the Data Breaches.

131. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

132. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII/PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

---

[23] *2019 Internet Crime Report* (Feb. 11, 2020) FBI.GOV, https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited October 20, 2025).
[24] *Id.*

133.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII/PHI. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

134.     As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII/PHI was compromised, as in the case of the first Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

135.     In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record.

136.     Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

137.     Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

138.     These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach,

including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[25]

139.    Once PII/PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breaches.

---

[25] *See Federal Trade Commission*, IDENTITYTHEFT.GOV, https://www.identitytheft.gov/Steps (last visited October 20, 2025).

### *Diminished Value of PII/PHI*

140.     Personal data like PII/PHI is a valuable property right.[26]

141.     Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII/PHI has considerable market value.

142.     An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[27]

143.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.

144.     For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[28] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[29] All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, SSNs, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to

---

[26] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII/PHI") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII/PHI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted) (last visited October 20, 2025).

[27] *Shadowy data brokers make the most of their invisibility cloak* (Nov. 5, 2019) LA TIMES, https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited October 20, 2025).

[28] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/. (last visited October 20, 2025).

[29] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited October 20, 2025).

$1,300 each on the black market.[30] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[31] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[32]

145.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[33] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[34]

146.    As a result of the Data Breaches, Plaintiffs' and Class Members' PII/PHI, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

147.    However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the PII/PHI is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

---

[30] Adam Greenberg, *Health insurance credentials fetch high prices in the online black market*, SC Magazine (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market (last visited October 20, 2025).
[31] *In the Dark*, VPNOverview.com, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited October 20, 2025).
[32] *See Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI Cyber Division (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf (last visited October 20, 2025).
[33] *The Personal Data Revolutaion,* DATA COUP, https://datacoup.com/ *and How it Works,* DIGI.ME, https://digi.me/what-is-digime/ (last visited October 20, 2025).
[34] *Frequently Asked Questions*, NIELSEN COMPUTER & MOBILE PANEL, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited October 20, 2025).

### *Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary*

148.    To date, Defendant has done little to provide Plaintiffs and Class Members with

relief for the damages they have suffered due to the Data Breaches.

149.    Given the type of targeted attack in this case and sophisticated criminal activity, the

type of information involved, and the modus operandi of cybercriminals, there is a strong

probability that entire batches of stolen information have been placed, or will be placed, on the

dark web for sale and purchase by criminals intending to utilize the PII/PHI for identity theft

crimes— e.g., opening bank accounts in the victims' names to make purchases or to launder

money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

150.    Such fraud may go undetected until debt collection calls commence months, or even

years, later. An individual may not know that his or her information was used to file for

unemployment benefits until law enforcement notifies the individual's employer of the suspected

fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax

return is rejected.

151.    Furthermore, the information accessed and disseminated in the Data Breaches is

significantly more valuable than the loss of, for example, credit card information in a retailer data

breach, where victims can easily cancel their cards and request a replacement.[35]

152.    The information disclosed in the first Data Breach is impossible to "close" and

difficult, if not impossible, to change (such as Social Security numbers).

---

[35] Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds,*
FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-
securitynumber-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited
October 20, 2025).

153.    Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

154.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breaches. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their PII/PHI.

### *Lost Benefit of the Bargain*

155.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

156.    When agreeing to provide their PII/PHI, Plaintiffs and Class Members, as employees, understood and expected that they were, in part, paying for services and data security to protect the PII/PHI they were required to provide.

157.    Plaintiffs value data security. Indeed, data security is an important consideration when seeking employment.

158.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[36] Therein, Cisco reported the following:

    a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer

---

[36] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited October 20, 2025).

respondents saying they won't purchase from an organization they don't

trust with their data."[37]

b.      "Privacy has become a critical element and enabler of customer trust, with

94% of organizations saying their customers would not buy from them if

they did not protect data properly."[38]

c.      89% of consumers stated that "I care about data privacy."[39]

d.      83% of consumers declared that "I am willing to spend time and money to

protect data" and that "I expect to pay more" for privacy.[40]

e.      51% of consumers revealed that "I have switched companies or providers

over their data policies or data-sharing practices."[41]

f.      75% of consumers stated that "I will not purchase from organizations I don't

trust with my data."[42]

### *Defendant Could Have Prevented the Data Breaches*

159.    Data breaches are preventable.[43] As Lucy Thompson wrote in the Data Breach and

Encryption Handbook, "In almost all cases, the data breaches that occurred could have been

prevented by proper planning and the correct design and implementation of appropriate security

solutions."[44] She  added that "[o]rganizations that collect, use, store, and share sensitive personal

---

[37] *Id*. at 3.
[38] *Id*.
[39] *Id*. at 9.
[40] *Id*.
[41] *Id*.
[42] *Id*. at 11.
[43] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA
BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).
[44] *Id.* at 17.

data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[45]

160.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs." [46]

161.    In the Data Breaches like the one here, many failures laid the groundwork for the breach.

162.    For example, the FTC has published guidelines that establish reasonable data security practices for businesses. The guidelines also emphasize the importance of having a data security plan, regularly assessing risks to computer systems, and implementing safeguards to control such risks.

163.    Additionally, several industry-standard best practices have been identified that—at a minimum—should be implemented by businesses like Defendant.

### Defendant Failed to Adhere to FTC Guidelines

164.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII/PHI.

---

[45] *Id.* at 28.
[46] *Id.*

165.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide

for Business, which established guidelines for fundamental data security principles and practices

for business.  The guidelines explain that businesses should:

a.      protect the personal customer information that they keep;

b.      properly dispose of personal information that is no longer needed;

c.      encrypt information stored on computer networks;

d.      understand their network's vulnerabilities; and

e.      implement policies to correct security problems.

166.    The guidelines also recommend that businesses watch for large amounts of data

being transmitted from the system and have a response plan ready in the event of a breach.

167.    The FTC recommends that companies not maintain information longer than is

needed for authorization of a transaction; limit access to sensitive data; require complex passwords

to be used on networks; use industry-tested methods for security; monitor for suspicious activity

on the network; and verify that third-party service providers have implemented reasonable security

measures.

168.    The FTC has brought enforcement actions against businesses for failing to

adequately and reasonably protect customer data, treating the failure to employ reasonable and

appropriate measures to protect against unauthorized access to confidential consumer data as an

unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15

U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take

to meet their data security obligations.

169.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to employees' PII/PHI constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

### Defendant Failed to Follow Industry Standards

170.    Experts studying cyber security routinely identify corporations as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

171.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendant. These industry standards include: educating all employees regarding cybersecurity; strong passwords; multi-layer security, including firewalls, anti-virus, and anti- malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

172.    Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

173.    Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, Defendant should have promptly deleted the data belonging to employees.

174.    Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02,

PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

175.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breaches.

### *Defendant Violated HIPAA*

176.    HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[47]

177.    The Data Breaches resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

- failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

- failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

- failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

---

[47] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

- failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

- failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

- failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

- failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

- failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

- failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

178.    Simply put, the Data Breaches resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

## CLASS ACTION ALLEGATIONS

179.    Plaintiffs brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following classes:

> All individuals residing in the United States whose PII/PHI was
> compromised in the February 2025 Data Breach of Defendant's
> network, including all those individuals who received notice of the
> breach.
>
> All individuals residing in the United States whose PII/PHI was
> compromised in the March 2025 Data Breach of Defendant's
> network.

180. Excluded from the Classes are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including its staff and immediate family.

181. Plaintiffs reserve the right to amend the class definition.

182. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

183. This action satisfies the numerosity, commonality, typicality, and adequacy requirements.

184. **Numerosity.** The Class members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes thousands of members.

185. **Commonality and Predominance.** Plaintiffs' and the Class Members' claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

 a. if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class Members' PII/PHI;

b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breaches;

c.    if Defendant was negligent in maintaining, protecting, and securing PII/PHI;

d.    if Defendant breached contract promises to safeguard Plaintiffs and the Class Members' PII/PHI;

e.    if Defendant took reasonable measures to determine the extent of the Data Breaches after discovering it;

f.    if Defendant's Breach Notice was reasonable;

g.    if the Data Breaches caused Plaintiffs and the Class injuries;

h.    what the proper damages measure is; and

i.    if Plaintiffs and the Class Members are entitled to damages, treble damages, and or injunctive relief.

186.    **Typicality.** Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breaches, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breaches.

187.    **Adequacy.** Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class Members behalf.

188.    **Appropriateness.** The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

Plaintiffs is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

189.   **Ascertainability.**   All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some victims and sent them Data Breach notices.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiffs and both Classes)

190.   Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

191.   Plaintiffs and the Class Members entrusted their PII/PHI to Defendant on the premise and with the understanding that Defendant would safeguard their PII/PHI, use their PII/PHI for business purposes only, and/or not disclose their PII/PHI to unauthorized third parties.

192.   Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII/PHI in a data breach. And here, that foreseeable danger came to pass.

193.   Defendant's duty of care is an independent, non-contractual duty of care arising from the special relationship between Defendant and Plaintiff, and the fact Defendant assume responsibility to collect and store Plaintiffs and the Class Members' PII/PHI.

194.   Defendant has full knowledge of the sensitivity of the PII/PHI and the types of harm that Plaintiffs and the Class Members could and would suffer if their PII/PHI was wrongfully disclosed.

195.   Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew

or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs' and Class Members' PII/PHI.

196.    Defendant owed to Plaintiffs and Class Members at least the following duties to:

a.    exercise reasonable care in handling and using the PII/PHI in its care and custody by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII;

b.    to adequately monitor the security of its networks and systems;

c.    to prevent unauthorized access to Plaintiffs and Class members PII;

d.    to detect, in a timely manner, that Plaintiffs' and Class members' PII had been compromised; and

e.    to remove former employees' PII it was no longer required to retain pursuant to regulations from its systems.

197.    Plaintiffs and Class members about the Data Breaches' occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; Also, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breaches. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII/PHI, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breaches.

198.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII/PHI it was no longer required to retain under applicable regulations.

199.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII/PHI of Plaintiffs and the Class Members involved an unreasonable risk of harm to Plaintiffs and the Class Members, even if the harm occurred through the criminal acts of a third party.

200.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class Members. That special relationship arose because Plaintiffs and the Class Members entrusted Defendant with their confidential PII/PHI, a necessary part of employment from Defendant.

201.    The risk that unauthorized persons would attempt to gain access to the PII/PHI and misuse it was foreseeable. Given that Defendant holds vast amounts of PII/PHI, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII/PHI —whether by malware or otherwise.

202.    PII/PHI is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII/PHI of Plaintiffs and Class Members  and the importance of exercising reasonable care in handling it.

203.    Defendant improperly and inadequately safeguarded the PII/PHI of Plaintiffs and the Class Members in deviation of standard industry rules, regulations, and practices at the time of the Data Breaches.

204.    Defendant breached these duties as evidenced by the first and second Data Breach.

205.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs 'and Class Members' PII/PHI by:

a.    disclosing and providing access to this information to third parties and

b.      failing to properly supervise both the way the PII/PHI was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

206.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII/PHI of Plaintiffs and Class Members which actually and proximately caused the Data Breaches and Plaintiffs' and Class Members' injury.

207.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breaches to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breaches and Plaintiffs' and Class Members' injuries-in-fact.

208.    Defendant has admitted that the PII/PHI of Plaintiffs and the Class Members was accessed by an intruder to its systems.

209.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

210.    Furthermore, Defendant's grossly negligent conduct is underscored by the fact that it was breached a second time, just one month after the first data breach.

211.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII/PHI by criminals, improper disclosure of their PII/PHI, lost value of their PII/PHI, and lost time and money incurred to mitigate and remediate the effects of the Data Breaches that resulted from and were

caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Negligence *per se***
**(On Behalf of Plaintiffs and both Classes)**

212.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

213.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data. Plaintiffs and Class members are within the class of persons that Section 5 of the FTCA was intended to protect. The harm occurring as a result of the Data Breaches is the type of harm that Section 5 of the FTCA intended to guard against. Defendant violated Section 5 of the FTCA by failing to adequately safeguard Plaintiffs' and Class members' PII/PHI.

214.    Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII/PHI.

215.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII/PHI Defendant had collected and stored and the foreseeable consequences of a Data Breaches, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

216.    Plaintiffs are members of the class of persons that the FTC Act was designed to protect, and the harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class Members.

217.    Defendant's duty to use reasonable security measures also arose under the HIPPA, under which they were required to protect the security, confidentiality, and integrity of consumer health information. Plaintiffs are members of the class of persons that HIPPA was designed to protect, and the harm that occurred as a result of the Data Breaches is the type of harm that the HIPPA intended to guard against. Defendant violated the HIPPA by failing to adequately safeguard Plaintiffs' and Class members' PII/PHI.

218.    Furthermore, New York's SHIELD Act, General Business Law § 899-bb, requires covered businesses to implement and maintain reasonable administrative, technical, and physical safeguards to protect private information of New York residents such as Plaintiff Powers. Defendant's failure to implement safeguards constituted a violation of GBL § 899-bb, which was enacted specifically to protect individuals like Plaintiff Powers from the very type of data breach and resulting harm that occurred here.

219.    Plaintiff Power is a member of the class of persons that the SHIELD Act was designed to protect, and the harm Plaintiff Powers suffered — including the theft, misuse, and exposure of personal information — is the type of harm the statute was intended to prevent.

220.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

221.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their PII/PHI.

222.    Defendant's violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

223.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### THIRD CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiffs and both Classes)**

224.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

225.    Defendant offered to provide employment and/or services to Plaintiffs and members of the Class if, and in exchange, Plaintiffs and members of the Class provided Defendant with their PII/PHI.

226.    In providing their PII/PHI, Plaintiffs and Class members entered into an implied contract with Defendant, whereby Defendant, in receiving such data, became obligated to reasonably safeguard Plaintiffs' and the other Class members' PII/PHI.

227.    Plaintiffs and the members of the Class accepted Defendant's offer by providing PII/PHI to Defendant in exchange for employment.

228.    Implicit in the agreement between Plaintiffs and Class members and the Defendant to provide PII/PHI, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII/PHI, (c) prevent unauthorized disclosures of the PII/PHI, (d) provide Plaintiffs and Class members with prompt and sufficient notice of any and all

unauthorized access and/or theft of their PII/PHI, (e) reasonably safeguard and protect the PII of

Plaintiffs and Class members from unauthorized disclosure or uses, and (f) retain the PII only

under conditions that kept such information secure and confidential.

229.     Plaintiffs and the members of the Class would not have entrusted their PII/PHI to

Defendant in the absence of such an agreement with Defendant.

230.     Defendant accepted possession of Plaintiffs' and Class members' PII/PHI.

231.     Had Defendant disclosed to Plaintiffs and Class members that Defendant did not

have adequate computer systems and security practices to secure consumers' PII/PHI, Plaintiffs

and Class members would not have provided their PII to Defendant.

232.     Defendant recognized that consumers' PII is highly sensitive and must be protected,

and that this protection was of material importance as part of the bargain to Plaintiffs and Class

members.

233.     Plaintiffs and Class members fully performed their obligations under the implied

contracts with Defendant.

234.     Defendant materially breached the contracts it had entered with Plaintiffs and

members of the Class by failing to safeguard such information and failing to notify them promptly

of the intrusions into its computer systems that compromised such information. Defendant also

breached the implied contracts with Plaintiffs and members of the Class by:

    a.      Failing to properly safeguard and protect Plaintiffs' and members of the
            Class's PII/PHI;

    b.      Failing to comply with industry standards as well as legal obligations that
            are necessarily incorporated into the parties' agreement; and

c.      Failing to ensure the confidentiality and integrity of electronic PII/PHI that Defendant created, received, maintained, and transmitted.

235.    As a direct and proximate result of the breach of the contractual duties, Plaintiffs and Class members have suffered actual, concrete, and imminent injuries. The injuries suffered by Plaintiffs and the Class members include: (a) the invasion of privacy; (b) the compromise, disclosure, theft, and unauthorized use of Plaintiffs' and Class members' PII; (c) economic costs associated with the time spent to detect and prevent identity theft, including loss of productivity; (d) monetary costs associated with the detection and prevention of identity theft; (e) economic costs, including time and money, related to incidents of actual identity theft; (f) the emotional distress, fear, anxiety, nuisance and annoyance of dealing related to the theft and compromise of their PII; (g) the diminution in the value of the services bargained for as Plaintiffs' and Class members were deprived of the data protection and security that Defendant promised when Plaintiffs and the Class members entrusted Defendant with their PII; and (h) the continued and substantial risk to Plaintiffs' and Class members' PII/PHI, which remains in the Defendant's possession with inadequate measures to protect Plaintiffs' and Class members' PII/PHI.

236.    Additionally, the covenant of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

237.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

238.    Defendant failed to advise Plaintiffs and members of the Class of that there was not one but two data breaches, and failed to send Notice to the victims promptly and sufficiently.

239.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

240.    Plaintiffs and members of the Class have sustained damages because of Defendant's breaches of its agreement, including breaches of it through violations of the covenant of good faith and fair dealing.

241.    Plaintiff, on behalf of themselves and the Class, seeks compensatory damages for breach of implied contract, which includes the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and both Classes)

242.    Plaintiffs incorporate all previous paragraphs as if fully set forth herein.

243.    This claim is pleaded in the alternative to the breach of implied contract claim.

244.    Upon information and belief, Defendant funds its data security measures from its general revenue, including the money generated from Plaintiffs' and the Class Members' employment services, and payments made by or on behalf of Plaintiffs and the Class Members.

245.    As such, a portion of the revenue gleaned from Plaintiffs' and the Class Members' employment services, and a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

246.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they either provided services, in the form of employment, contracted with Defendant, or purchased services from Defendant and/or its agents and in so doing provided Defendant or its agents with their PII/PHI. In exchange, Plaintiffs and Class Members should have had their PII/PHI protected with adequate data security.

247.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII/PHI of Plaintiffs and Class Members for business purposes and employment services.

248.    Defendant was enriched by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII/PHI. Instead of providing a reasonable level of security that would have prevented the Data Breaches, Defendant calculated to avoid the data security obligations at the expense of Plaintiffs and the Class by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

249.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

250.    Defendant acquired the monetary benefit and PII/PHI through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

251.    If Plaintiffs and Class Members knew that Defendant had not secured their PII/PHI, they would not have agreed to provide their PII/PHI to Defendant.

252.    Plaintiffs and Class Members have no adequate remedy at law.

253.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity how their PII/PHI is used; (ii) the compromise, publication, and/or theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breaches, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII/PHI, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect PII/PHI in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII/PHI compromised as a result of the Data Breaches for the remainder of the lives of Plaintiffs and the Class.

254.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them.

## FIFTH CAUSE OF ACTION
### Invasion of Privacy
### (On Behalf of Plaintiffs and both Classes)

255.    Plaintiffs incorporates all previous paragraphs as if fully set forth herein.

256.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their PII/PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

257.    Defendant owed a duty to Plaintiffs and Class Member to keep their PII/PHI confidential.

258.    The State of Colorado recognizes several distinct types of Invasion of Privacy claims including intrusion upon seclusion, public disclosure of private facts, and appropriation of name or likeness.

259.    The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' PII/PHI is highly offensive to a reasonable person. It constitutes an invasion of privacy both by disclosure of nonpublic facts, and intrusion upon seclusion.

260.    The subsequent publication of the stolen PII on the Dark Web is highly offensive to a reasonable person.

261.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class members disclosed their sensitive and confidential information to Defendant as part of seeking Defendant's services, or in the process of obtaining employment, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

262.    The Data Breaches constitute an intentional interference with Plaintiffs' and the Class members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

263.    Defendant acted with a knowing state of mind when it permitted the Data Breaches because it knew its information security practices were inadequate.

264.    Defendant acted with a knowing state of mind when it failed to notify Plaintiffs' and the Class members in a timely fashion about the Data Breaches, thereby materially impairing their mitigation efforts.

265.     Defendant had notice and knew or should have known that its inadequate cybersecurity practices would cause injury to Plaintiffs' and the Class members.

266.     Because Defendant failed to properly safeguard Plaintiffs' and Class Members' PII/PHI, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

267.     As a proximate result of Defendant's acts and omissions, the PII/PHI of Plaintiffs and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

268.     Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII/PHI is still maintained by Defendant with their inadequate cybersecurity system and policies.

269.     Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their PII/PHI. A judgment for monetary damages will not end Defendant's inability to safeguard the PII/PHI of Plaintiffs and the Class.

270.     Plaintiffs and Class Members, seek injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PII/PHI.

271.     Plaintiffs and Class Members seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

**SIXTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiffs and both Classes)**

272.     Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

273.     Given the relationship between Defendant and Plaintiffs and the Class Members, where Defendant became guardian of Plaintiffs' and Class Members' PII/PHI, Defendant became a fiduciary by its undertaking and guardianship of the PII/PHI, to act primarily for Plaintiffs and Class members, (1) for the safeguarding of Plaintiffs and Class members' PII/PHI; (2) to timely notify Plaintiffs and Class Members of the Data Breaches and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

274.     Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of Defendant's relationship with them—especially to secure their PII/PHI.

275.     Because of the highly sensitive nature of the PII/PHI, Plaintiffs and Class members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII/PHI had they known the reality of Defendant's inadequate data security practices.

276.     Defendant breached its fiduciary duties to Plaintiffs and Class members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class members' PII/PHI.

277.     Defendant also breached its fiduciary duties to Plaintiffs and Class members by failing to diligently discover, investigate, and give notice of the Data Breaches within a reasonable and practicable time period.

278.     As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

### SEVENTH CAUSE OF ACTION
### Declaratory Judgment
### (On Behalf of Plaintiffs and both Classes)

279.     Plaintiffs incorporates by reference all other paragraphs as if fully set forth herein.

280.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

281.    In the fallout of the Data Breaches, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class members continue to suffer injury from the ongoing threat of fraud and identity theft.

282.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.    Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b.    Defendant has a duty to notify impacted individuals of the Data Breaches under the common law and Section 5 of the FTC Act;

c.    Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d.    Defendant's breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class members.

283.    The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

284.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences another data breach.

285.    And if another breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class members' injuries.

286.    If an injunction is not issued, the resulting hardship to Plaintiffs and Class members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

287.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class members, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of all others similarly situated, prays for relief as follows:

a.    For an order certifying the Class, and naming Plaintiffs as representatives of the Class, and Plaintiffs' attorneys as Class Counsel;

b.    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

c.    For damages in an amount to be determined by the trier of fact;

d.    For an order of restitution and all other forms of equitable monetary relief;

e.    Declaratory and injunctive relief as described herein;

f.    Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses as otherwise allowed by law;

g.    Awarding pre- and post-judgment interest on any amounts awarded; and

h.    Awarding such other and further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the putative Class, demands a trial by jury on all claims so triable.

Dated: October 20, 2025

By: */s/ Raina C. Borrelli*
Raina C. Borrelli
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
raina@straussborrelli.com

*Attorneys for Plaintiffs and the Proposed Class*